## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **MIDWEST GENERATION EME, LLC ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. 08 C 7189** |
| | ) | |
| **CONTINUUM CHEMICAL CORPORATION,** | ) | |
| | ) | **Magistrate Judge Cole** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## AMENDED MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Having prevailed before a unanimous three-member arbitration panel, Midwest Generation EME, LLC ("Midwest") has moved to confirm the award. Continuum Chemical Corporation ("Continuum") has filed a petition to vacate the award, based on the "evident partiality" of one of the arbitrators, Stanley Sklar. It is Continuum's contention that it must be allowed to take limited discovery of Mr. Sklar because it has compelling evidence that Mr. Sklar intentionally concealed from it and its lawyers "a system of referrals and ongoing economic and professional business relationships between [himself], the Construction Law Group at his [then law] firm [Bell, Boyd & Lloyd, where he was a partner from 1995 to 2008], and lawyers in the Construction Law Group of opposing counsel, Schiff Hardin LLP." (Continuum's Motion for Leave to Take Limited Discovery at 2). (Continuum's Amended Brief in Support of Motion to Take Limited Discovery at 7, 9, 10).

The Reply Brief in support of the Motion To Take Limited Discovery retreats somewhat from this stark position and subtly recasts the claimed relationship, describing it as one that "rise[s] to the

level of a de facto marketing relationship, whose purpose was to market the professional services of those involved." *Id.* at 2. Later in the reply brief, the conclusion is that this informal marketing relationship was designed to bolster "the business credentials and to secure future business" of and for Mr. Sklar and lawyers in the Schiff Hardin Construction Law Group. (Reply at 8). The Reply Brief concludes by saying that the alleged "ongoing professional relationships" – which are never specifically analyzed in the briefs – make it "not unreasonable... to think that there was also a reasonable probability that there may have been business referrals and other pecuniary interests between these parties." (Reply at 8).[1] And of course, these referrals were concealed by the arbitrator.

According to Continuum, it found the Arbitration Panel's November 2008 award against it so illogical that it "suspected that there must have been some other 'driving force' behind the Panel's decision." (Reply Brief at 10). And so Continuum investigated publicly available information, which led it to conclude that Mr. Sklar had willfully and illicitly concealed his "marketing relationship" with Schiff, Hardin lawyers. (Reply Brief at 2; *see also id.* at 7-8). If Continuum's ultimate conclusions are true, the arbitration process was seriously corrupted. *See generally*, *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 147-50 (1968); *Matter of Andros Compania Maritima, S.A.(Marc Rich & Co.)*, 579 F.2d 691, 701 (2d Cir. 1978); *Sun Refining & Marketing Co. v. Statheros Shipping Corp.*, 761 F.Supp. 293, 299 (S.D.N.Y.), *aff'd.*, 948 F.2d 1277 (2d Cir. 1991).

---

[1] While neither the Amended Brief nor the Reply says so, it would seem that there had to be either an understanding between Mr. Sklar and Schiff Hardin lawyers that they either would select Mr. Sklar or not oppose his selection as an arbitrator and that he in turn would favor Schiff's client at the arbitration. The payoff is Mr. Sklar keeps being selected as an arbitrator, and Schiff keeps winning, thereby enhancing its ability to attract clients. Calling the scheme a "marketing relationship" does not for a moment alter the true nature of what is being alleged, for "the logic of words should yield to the logic of realities." *DiSanto v. Pennsylvania*, 273 U.S. 34, 43 (1927)(Brandeis, J.). It cannot be too strongly emphasized that there is no evidence supporting Midwest's conclusion that such a squalid scheme existed.

"[A] judge cannot have a prospective financial relationship with one side yet persuade the other that he can judge fairly in the case." *Pepsico v. McMillen*, 764 F.2d 458, 461 (7th Cir. 1985). Nor can an arbitrator. "Under a realistic appraisal of psychological tendencies and human weakness," *Withrow v. Larkin*, 421 U.S. 35, 47 (1975), where that relationship involves a system of referrals, bias is inherent and inescapable, for "[g]etting and keeping customers, is, of course, the life blood of any business." *Kennedy v. C.I.R.*, 671 F.2d 167, 176 (6th Cir. 1982).

It is Continuum's contention that Mr. Sklar's failure to disclose certain professional contacts he had with certain lawyers at Schiff Hardin violated his continuing duty to disclose any circumstance or relationship likely to give rise to "*justifiable* doubt" as to the arbitrator's impartiality and which might "*reasonably* affect impartiality or lack of independence," Canon II, §A(2) of the AAA Code of Ethics for Arbitrators in Commercial Disputes (emphasis supplied). Continuum contends it is entitled to take limited discovery of Mr. Sklar to prove its claim of "evident partiality" under § 10(a)(2) of the Federal Arbitration Act. Evident partiality exists when an arbitrator's bias is "'direct, definite and capable of demonstration rather than remote, uncertain, or speculative.'" *Harter v. Iowa Grain Co.*, 220 F.3d 544, 553 -54 (7th Cir. 2000); Continuum Reply Brief at 3. It is only when a "reasonable person would... conclude that an arbitrator was partial" that it can be said that evident partiality has been shown, and an arbitration award should be vacated. *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 151 (1968)(White, J., concurring); *Merit Insurance Co. v. Leatherby Insurance Co.*, 714 F.2d 673 (7th Cir. 1983)(Posner, J.).

## DISCUSSION

Post-arbitration discovery is rare, and courts have been extremely reluctant to allow it. It is often a "tactic" employed by disgruntled or suspicious parties who, having lost the arbitration, are

3

anxious for another go at it.[2] Not surprisingly, requests to take discovery of arbitrators have been "repeatedly condemned." *See Woods v. Saturn Distribution Corp.*, 78 F.3d 424, 430 (9th Cir.), *cert. dismissed*, 518 U.S. 1051 (1966); *O.R. Securities, Inc. v. Professional Planning Assocs., Inc.*, 857 F.2d 742, 748 (11th Cir.1988); *Legion Insurance Co. v. Insurance General Agency, Inc.*, 822 F.2d 541, 543 (5th Cir. 1987); *Matter of Andros Compania Maritima, S.A. (Marc Rich & Co., A.G.)*, 579 F.2d 691, 700-702 (2nd Cir. 1978). It is only allowed where there is "clear evidence of impropriety." *Woods*, 78 F.3d at 430. *Accord Lucent Technologies Inc. v. Tatung Co.*, 379 F.3d 24, 32 (2nd Cir. 2004); *Lyeth v. Chrysler Corp.*, 929 F.2d 891, 899 (2nd Cir. 1991); *Matter of Andros Compania Maritima, S.A. (Marc Rich & Co., A.G.)*, 579 F.2d at 700-702; *Uhl v. Komatsu Forklift Co., Ltd.*, 466 F.Supp.2d 899, 910 (E.D.Mich. 2006), *aff'd.*, *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294 (6th Cir. 2008); *In re EquiMed, Inc.*, 2005 WL 2850373, *2 (E.D.Pa. 2005).

Continuum has struggled with the evidentiary standard that must be met before post-award discovery will be permitted. Initially, it argued that the "clear evidence" standard should not apply. In its first brief, Continuum said:

> The Second Circuit has established that if a party wishes to take discovery as to the potential partiality of an arbitrator, then that party must first establish "clear evidence of [arbitral] impropriety or bias." *See Lyeth v. Chrysler Corp.*, 929 F.2d 891, 899 (2nd Cir. 1991). This Court should not adopt the "clear evidence" standard for allowing discovery.

(*Continuum's Brief in Support* [#51], at 2). Continuum's first reply brief, then conceded:

> While Continuum initially took a different position in its Brief in Support of its Motion for Leave to Take Limited Discovery . . . Continuum now agrees with Midwest that the "clear evidence of impropriety" standard should govern the matter.

---

[2] Motions for judicial recusal are also often used as tactical weapons, and the cases are replete with warnings that courts should take special care to prevent abuse and manipulation. *Sensley v. Albritton*, 385 F.3d 591, 598 (5th Cir. 2004).

(*Continuum's Reply* [#51], at 2).

When the briefing concluded, it was discovered that Continuum had erroneously accused a second arbitrator of partiality, and Continuum was ordered to withdraw the allegations and file new briefs.[3] When Continuum filed its Amended Brief in support of its motion to take limited discovery, it appeared to resort to its original position:

> The Second Circuit has established that if a party wishes to take discovery as to the potential partiality of an arbitrator, then that party must first establish "clear evidence of [arbitral] impropriety or bias." *See Lyeth v. Chrysler Corp.*, 929 F.2d 891, 899 (2nd Cir. 1991). This Court should not adopt the "clear evidence" standard for allowing discovery.

(*Amended Brief* [#80], at 2).

This time, however, Continuum added a footnote:

> After careful consideration upon further review of the case law, Continuum came to believe that the Court should adopt the "clear evidence" standard as the matter of quantum of proof, in conjunction with the standard of "impropriety", as set out in our [Continuum's] original Reply Brief (Docket No. 51), where we acknowledged having switched our stance from the position on this matter set forth in the original Brief (Docket No. 40) and herein.

(*Continuum's Amended Brief in Support* at 2 n.1 [ #80]). Continuum proceeded to make the same three-page argument *against* the "clear evidence" standard it had advanced in its original and withdrawn brief. Then, it abandoned it one final time in its Amended Reply Brief – sort of. While the first argument is captioned, "'Clear Evidence of Impropriety' Should Be The Standard For Allowing Discovery of An Arbitrator," the brief goes on to argue that the standard for "impropriety"

---

[3] When Continuum's claims of misconduct against Mr. Slutzky proved unsustainable, Continuum moved to withdraw the incorrect allegations. [#55]. That motion was granted, and the charges against Mr. Slutzky have been withdrawn and/or dismissed. [#83]. Unaffected by the withdrawal or striking of the inaccurate briefs is Midwest's ability to seek sanctions and other relief under Fed. R. Civ. Pro. 11 and/or 28 U.S.C. 1927. Nothing in this opinion should be taken to suggest any view on that question.

should equate to the broader "appearance of bias" standard in *Commonwealth Coatings* (Reply at 4) – the very standard that the Seventh Circuit rejected decades ago in the context of determining whether an arbitrator's award should be vacated. *Health Services Management Corp. v. Hughes*, 975 F.2d 1253, 1264 (7th Cir. 1992)(evident partiality means more than a mere appearance of bias). The court in *Hughes* found no reason to vacate the award, because there was "no evidence in the record that indicate[d] that any close association ever existed between Hughes and the two arbitrators and certainly nothing that would give rise to a showing that there was 'evident partiality' on the part of either of the arbitrators." *Id.* at 1264.

While paying lip service to the clear evidence requirement, it is ultimately Continuum's position that it need only establish "clear evidence" of impropriety that might create "an appearance of bias." (Reply at 5). Continuum's formulation would appear to plunge us into what the Supreme Court, in another context, has called the "bog of logomachy," *NLRB v. Seven-Up Bottling Co. of Miami,* 344 U.S. 344, 348 (1953) and, through an adroit use of words, substitute the appearance of bias standard for the clear evidence standard. In any event, ultimately the test to determine whether there is sufficient evidence of impropriety, no matter how defined, must be objective, as all the courts have held. Continuum's formulation does not satisfy that requirement.

In one sense, judicial recusal under 28 U.S.C. §455 is instructive, although not, itself, dispositive. Section 455(a) requires that a judge step aside whenever his "impartiality might reasonably be questioned." The question must be answered from the vantage point not of a hypersensitive or unduly suspicious person, but from that of the hypothetical, reasonable, thoughtful observer, fully informed of all of the relevant facts underlying the grounds on which disqualification is sought. The Supreme Court is quite insistent on the "fully informed" component of the inquiry.

6

*Sao Paulo State of Federative Republic of Brazil v. American Tobacco Co., Inc.* 535 U.S. 229, 232-233 (2002); *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 541 U.S. 913, 924 (2004)(statement of Justice Scalia). So, too, are the courts of appeals. *See In re Sherwin-Williams*, _F.3d_, 2010 WL 2244119 (7th Cir. 2010); *In re Kensington International Ltd.*, 368 F.3d 289, 302-303 (3rd Cir. 2004).

Section 455(a) asks whether an informed person would perceive a significant risk that the judge will resolve the case on a basis other than the merits. *In re Mason*, 916 F.2d 384, 385-86 (7th Cir.1990). In *In re Sherwin-Williams Co.*, the court said:

> In addition to being well-informed about the surrounding facts and circumstances, for purposes of our analysis, a reasonable person is a "'thoughtful observer rather than... a hypersensitive or unduly suspicious person.' Finally, a reasonable person is able to appreciate the significance of the facts in light of relevant legal standards and judicial practice and can discern whether any appearance of impropriety is merely an illusion." 2010 WL 2244119 at *3 (citations omitted)(ellipses in original).

While it is true that arbitrators are not held to the same standard of judicial decorum as Article III judges, *Commonwealth Coatings*, 393 U.S. at 150, the same sort of objective inquiry is the appropriate one in cases such as this. The question is whether there is clear evidence of impropriety, viewed from the vantage point of such a "reasonable observer."

The "clear evidence" requirement is not as exacting as Continuum suggests. For example, it is textually less onerous than the "clear and unmistakable" standard that must be satisfied before it can be concluded that the parties' arbitration agreement withdrew the question of arbitrability (that is, whether the parties have submitted a particular dispute to arbitration) from judicial consideration. *Howsam v. Dean Witter Reynolds Inc.*, 537 U.S. 79, 82 (2002); *Employers Insurance Co. of Wausau v. Century Indem. Co.*, 443 F.3d 573, 576 (7th Cir. 2006); *James & Jackson, LLC v. Willie Gary LLC*, 906 A.2d 76, 80 (Del. 2006). And it is a less exacting standard than the "clear and convincing"

standard," which the Supreme Court has defined as placing in the ultimate fact finder an abiding conviction that the truth of the factual contentions is "highly probable." *Colorado v. New Mexico,* 467 U.S. 310, 316 (1984). *See also Cruzan by Cruzan v. Director Missouri Dept. of Health,* 497 U.S. 261, 285 (1990); *Parker For Lamon v. Sullivan,* 891 F.2d 185, 188 (7th Cir. 1989).

The function of any standard of proof is to indicate the degree of confidence society thinks a fact finder should have in the correctness of factual conclusions for a particular type of adjudication. By informing the fact finder in this manner, the standard of proof allocates the risk of erroneous judgment between the litigants and indicates the relative importance society attaches to the ultimate decision. *Colorado,* 467 U.S. at 315-16. The "clear evidence" standard manifests the courts' judgment that, while a conjurer's circle is not to be drawn around arbitrators, only non-speculative, reasonably certain evidence of impropriety will suffice to allow post-arbitration discovery.

A more relaxed standard would be incompatible with, and would undercut, the long standing, national policy favoring arbitration of claims that parties contract to settle in that manner, *Vaden v. Discover Bank,* 129 S.Ct. 1262, 1271 (2009), "'with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway.'" *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.,* 130 S.Ct. 1758, 1779 (2010). *See Dean v. Sullivan,* 118 F.3d 1170, 1173 (7th Cir.1997); *O.R. Securities, Inc.,* 857 F.2d at 747-748. In *O.R. Securities Inc.,* the court, in refusing to allow discovery, stressed that "[a]rbitration proceedings are summary in nature to effectuate the national policy of favoring arbitration, and they require 'expeditious and summary hearing, with only restricted inquiry into factual issues.' " A less exacting standard would render informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process by

subjecting arbitrators to discovery – "the bane of modern litigation." *Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 542 (7th Cir. 2000)(Posner, J.). That would, as the Court said in another context, "bring arbitration theory to grief in post-arbitration process." *Hall Street Associates, L.L.C. v. Mattel, Inc.* 552 U.S. 576, 588 (2008).[4]

In the last analysis, it does not matter what evidentiary formulation is employed because, under any standard, Continuum has not presented sufficient evidence that would justify requiring Mr. Sklar to be subjected to discovery. All that it has shown are a series of public, almost exclusively parallel, professional contacts involving lecturing and writing on construction related matters. These endeavors were "no secret," and their existence, as Continuum's Motion concedes, was readily discoverable to anyone who chose to look. *See Matter of Andros Compania Maritima, S.A. (Marc Rich & Co., A.G.)*, 579 F.2d at 702("but their service together on arbitration panels was no secret. Marc Rich based its claim of Arnold's inadequate disclosure upon 'an exhaustive review of approximately 1200 published awards'... which it conducted after the award was handed down. It could have made such a review just as easily before or during the arbitration rather than after it lost its case. Indeed, it is not at all uncommon for parties to check the past decisions of arbitrators before an arbitration begins.").[5]

These purely professional involvements are emblems of professional achievement about which lawyers, their publishers, and event organizers publically (and rightfully) boast on their websites and through advertisements to interested members of the bar. *Cf., In re EquiMed, Inc.*, 2005

---

[4] Neither *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.* nor *Hall Street Associates, L.L.C. v. Mattel Inc.* involved the issue of post-arbitration discovery.

[5] And it is no less common, indeed it is almost obligatory, for lawyers to review available writings of arbitrators, whether in decisions or legal publications or as presented at seminars.

WL 2850373 at *2 ("Apparently this evidence is not a matter of public record. Any evidence which is not a matter of public record should also be considered in determining whether a [post-arbitration] deposition is necessary or appropriate."). Even "[t]he securities laws do not require firms to 'disclose' information that is already in the public domain." *Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753, 759 (7th Cir.2007).

Significantly, Continuum has not cited a single case in its opening or reply brief that would support the conclusions it draws from the professional involvements of Mr. Sklar, Paul Lurie and Mark Friedlander, who are members of the Schiff Hardin Construction Law Group. Nor has it responded in its reply brief to the cases cited by Midwest in its response brief. The most Continuum's briefs do is to refer the court to the allegations in the Petition to Vacate, as though their mere recitation were enough to decide the case and to argue why Continuum believes a less onerous standard than the "clear evidence" standard should be applied. The purely professional, parallel endeavors set forth in the Amended Petition to Vacate cannot reasonably support Continuum's thesis that there is clear evidence of impropriety by Mr. Sklar, let alone that he was part of a "system of referrals and ongoing economic and professional business relationships" with Schiff Hardin lawyers.

Although the allegations of impropriety against Schiff Hardin and Mr. Sklar could scarcely be more damning, involving as they do claimed deliberate concealment in order to promote a system of business referrals, Continuum's Amended Brief rests largely on tendentious conclusions. Here is a sampling:

> Continuum should be entitled to conduct limited discovery *based on the allegations*, and on other facts *that are insinuated and implied in those allegations*, of evident partiality made in its Counter-Petition to Vacate Arbitration Award ("Petition to Vacate"), and further based on the evidence that it has already established.
> *(Amended Brief* (Dkt. #80), at 2)(emphasis supplied).

10

. . . Continuum should still be allowed to conduct limited discovery, based on evidence that it has already gathered with respect to the arbitrator's partiality. Continuum, through its own efforts, has already established an *ongoing business relationship* between Arbitrator Sklar and opposing counsel's law firm, Schiff Hardin, from a search of public information. (*Amended Brief* (Dkt. #80), at 3)(emphasis supplied).

Continuum has alleged facts in its Petition to Vacate which, if taken as true, would establish evident partiality, regardless of the standard used. Continuum's Petition to Vacate has set forth known facts of an *intimate business relationship* between Arbitrator Sklar and opposing counsel in the case, which were knowingly and intentionally not disclosed by Arbitrator Sklar. (*Amended Brief* (Dkt. #80), at 3)(emphasis supplied).

. . . this Court should not adopt the "clear evidence" standard to granting discovery, and should instead allow Continuum to take limited discovery if the allegations made in its Petition to Vacate, if taken as true, would establish evident partiality under the "appearance of bias" standard. . . . Even if the Court chooses to adopt the "clear evidence" standard, Continuum should still be entitled to take discovery based on the evidence that it has already established with respect to Arbitrator Sklar's partiality, as alleged in the Petition to Vacate. (*Amended Brief* (Dkt. #80), at 7).

Solely through the gathering of information that was available by public record, Continuum was able to establish evidence of an *ongoing business* and professional relationship between Arbitrator Sklar and his law firm Bell, Boyd & Lloyd and certain members of Schiff Hardin's CLG that was not disclosed by Arbitrator Sklar and more importantly, was deliberately concealed. A list of all the information that was discovered in Continuum's investigation is given in Paragraph 40 of Continuum's Petition to Vacate, a copy of which is attached hereto as Exhibit A. (*Amended Brief* (Dkt. #80), at 7)(emphasis supplied).

Continuum has alleged sufficient facts in its Petition to Vacate that, if proven, would constitute evident partiality on behalf of Arbitrator Sklar, regardless of the standard used. (*Amended Brief* (Dkt. #80), at 8).

Other than this, there is only a reference to ¶40 of the Amended Petition to Vacate. But all

¶40 says is:

The following findings by the Panel were made against the great and overwhelming weight of the evidence to the contrary

- there was no finding of fraud;
- the finding that there was a waiver/release of all future claims for

11

extra work; and
* the amount of the offsets awarded on the Counterclaim.
* the rulings with respect to the exclusion of certain evidence.

(*Amended Brief*, Ex. A, ¶ 40)

Of course, none of this is evidence of any sort, let alone evidence of impropriety on Mr.

Sklar's part. It is merely a conclusory list of disagreements that Continuum has with the Panel's

decision. But conclusions and allegations in briefs are not evidence and do not count. *See Ho v.*

*Donovan*, 569 F.3d 677, 682 (7th Cir. 2009); *United States v. Stevens,* 500 F.3d 625, 628 -629 (7th Cir.

2007); *Tibbs v. City of Chicago,* 469 F.3d 661, 663 n. 2 (7th Cir.2006); *Nisenbaum v. Milwaukee*

*County,* 333 F.3d 804, 810 (7th Cir. 2003); *Campania Mgmt. Co. v. Rooks, Pitts & Poust,* 290 F.3d

843, 853 (7th Cir.2002).

What "evidence" Continuum unearthed appears not in ¶40 of the Petition, but in ¶36 – as

pointed out in Midwest's response brief. Paragraph 36, as quoted in that brief, alleges that "Mr. Sklar

and members of Schiff Hardin's Construction Law Group":

(a) presented together at seminars for the College of Commercial Arbitrators, for the American Arbitra
("ABA"), for the Arbitration Training Institute at Golden State University, and at an
ABA Section on Dispute Resolution conference;

(b) co-authored various articles for the ALM Law Journal, the Practicing Law
Institute, a Lorman Education Services publication, and the Illinois Institute for
Continuing Education;[6]

(c) were past presidents (at different times) or members of the Society of Illinois Construction Attorne

(d) were members of an ABA Real Estate Advisory Board; and

(g) developed continuing education programs for non-lawyers for the AAA.

---

[6] These tacit concessions of co-authorships appear to have been improvident. I am not bound by that
error. *United States v. Anderson,* 547 F.3d 831, 832 (7th Cir. 2008). *See infra* at 17-20.

Paragraph 36 of the actual Petition to Vacate gives the particulars of the above adumbration. These particulars reveal nothing beyond the kind of professional interactions that one would expect of successful lawyers active in the specialized area in which Mr. Sklar and the lawyers at Schiff Hardin's Construction Law Group functioned. They do not support the claim that "there is a system of referrals and ongoing economic and professional business relationships between [Mr.] Sklar, the Construction Law Group at his law firm [Bell, Boyd & Lloyd] and the Construction Law Group of opposing counsel, Schiff Hardin LLP." In fact, they demonstrate the untenability of the conclusion.

With three exceptions, the events about which Continuum complains occurred after Mr. Sklar's June 1, 2006 pre-arbitration disclosure and thus could not have been disclosed in that statement.[7] And given their nature, they were not required to be disclosed thereafter. We begin with the post-2006 activities of Mr. Sklar, Paul Lurie and Kenneth Roberts (counsel for Midwest in the current arbitration and member of the Schiff Hardin Construction Law Group), who are alleged to have "presented" at the 9th Annual ABA Section on Dispute Resolution, Spring Conference, in April 2007, in Washington D.C. No further details are given by Continuum. But how successful lawyers' simultaneous participation in an American Bar Association annual meeting, even if true, is even suggestive of some intimate business or personal relationship, Continuum's brief does not pause to explain.

Mr. Sklar, Mr. Leavitt, Mr. Kolton of Schiff Hardin and Mr. Lurie are also alleged to have

---

[7] Continuum amended brief does not take note of the chronology, thus accounting for its claim that "Sklar has been consistently collaborating on events and activities with members of the Construction Law Group of Schiff Hardin (two of whom were counsel in the arbitration), on a regular basis for the last several years. This directly contradicts the disclosure statement which does not reflect these contacts and instead suggests a very minimal relationship mostly coming from being adverse on cases." (Amended Petition to Vacate, ¶37).

presented at *What to Do When Construction Projects Go Bad in Illinois,* a seminar that Continuum states was held on September 18, 2008, at the Holiday Inn in Itasca, Illinois, while the Arbitrators were deliberating the case. While the observations discussed above apply here with equal force, there is another aspect to this allegation. It appears to be untrue. According to the affidavits of Mr. Kolton and Mr. Lurie, the Lorman seminar was canceled. *See* Exs. E and F to Midwest's Response to Amended Counter-Petition to Vacate. [#101]. Continuum's Reply Brief does not address these affidavits, and the failure to respond to an opposing party's argument implies concession. *See MCI WorldCom Network Services, Inc. v. Atlas Excavating, Inc.,* 2006 WL 3542332 at *3 (N.D.Ill. 2006)(Moran, J.); *Drummer v. Bank,* 2006 WL 2051331 at *5 (N.D.Ill. 2006) (Kennelly, J.). *Cf. Law v. Medco Research, Inc.,* 113 F.3d 781, 787 (7th Cir. 1997)("Failure to contest a point is not necessarily a waiver, but it is a risky tactic, and sometimes fatal."); *Milam v. Dominick's Finer Foods, Inc.,* 567 F.3d 830, 832 (7th Cir. 2009)(Easterbrook, C.J.)("My earlier opinion explained why secrecy appears to be unwarranted, and I take plaintiffs' silence in their response as acknowledgment.").

Mr. Sklar, Josh Leavitt, and Paul Laurie also spoke at the *Condominiums Opportunity and Pitfalls* seminar, which was held on February 15, 2007. Mr. Sklar was the program's Co-Chair. Similarly inconsequential is the claimed participation by Messrs. Sklar and Lurie as presenters at the College of Commercial Arbitrators' 7th Annual Meeting in New York on October 26, 2008, which, ¶36 alleges, was during the course of the hearing. Mr. Sklar and Mr. Lurie also participated in the *Navigating the Arbitration Roadmap* seminar, hosted by the American Arbitration Association University, on November 6, 2008 in Chicago, Illinois. Mr. Sklar and Paul Lurie were presenters at the Real Estate Law Conference *Making Mediation & Arbitration Work in Real Estate Disputes* seminar on November 11, 2008 at the Westin Chicago River North. Mr. Sklar, Josh Leavitt and Paul

14

Lurie presented at the ABA Telephone Seminar Live Telephone/Audio Webcast, *Construction Defects in a Time of Financial Crisis,* on October 23, 2007, which was during the course of the hearing.

The Amended Brief does not claim that there were no other speakers or presenters at these professional events or that Mr. Sklar *et al.* collaborated on their presentations. It makes no attempt to explain what significance these separate, simultaneous participations in professional seminars has or how it supports the conclusion that there was a system of referrals and ongoing economic and professional business relationships between Mr. Sklar and the Schiff Hardin lawyers. It simply contents itself with noting what occurred. [8]

Then there is the contention that Mr. Sklar, Josh Leavitt and Paul Laurie were members of the 2007 Real Estate Conference Advisory Board, and that Mr. Sklar is the Treasurer and Paul Lurie is *currently* on the Amicus of the Committee for the College of Commercial Arbitrators Board & Officers. No attempt is made to explain how mere concurrent membership in a professional association can justify the kind of relief that courts in far more compelling circumstances have repeatedly denied. These involvements certainly cannot be classified as business relationships, and even "some prior business relationship between [a lawyer]... and arbitrators ...is not in and of itself sufficient to disqualify them as arbitrators." *Merit Insurance Co.,* 714 F.2d at 680. To be a disqualifier, the relationship must be "'so intimate-personally, socially, professionally, or financially-as to cast serious doubt' on the arbitrator's impartiality." *Id.* Concurrent participation in a professional

---

[8] It is fair to assume that, had there been more than merely parallel action, the Petition to Vacate would have said so. *Cf. Muhammad v. Oliver,* 547 F.3d 874, 877 (7th Cir. 2008) (Posner, J)("[I]f there is an executed standstill agreement, one would expect an allegation to that effect. There is none. The complaint's silence is deafening.").

seminar or on a board or committee is patently insufficient to justify post-arbitration discovery. *See United States Wrestling Federation v. The Wrestling Division of the AAU, Inc.*, 605 F.2d 313, 318 (7th Cir. 1979); *Harter, supra.* [9]

Paragraph 36 goes on to allege that Mr. Sklar, Mark Friedlander (Co-Chair of the Schiff Hardin Construction Law Group), and Josh Leavitt (a member of the Bell Boyd Construction Law Group), participated in writing articles for the Practicing Law Institute – Drafting and Negotiating Construction Contracts, in 2008 (an internet based program), which was during the course of the arbitration. The PLI website is informative. It reveals that the course handbook came out in early 2008 and contained 11 separate chapters. Mr. Sklar's did not have a co-author, nor did Mr. Friedlander's. Josh Leavitt does not appear as an author in 2008. http://www.pli.edu/product/book_detail.asp?id=38513. The 2009 edition contains 16 chapters. Mr. Leavitt, Mr. Sklar and Mr. Friedlander each authored separate chapters. http://www.pli.edu/product/book_detail.asp?id=47631. The fortuity that these individuals wrote articles/chapters that appeared in the same publication is analytically irrelevant. [10]

The same is true of the fact that Mr. Friedlander and Mr. Sklar were both Past Presidents of the Society of Illinois Construction Attorneys Steering Committee at different times. Kevin Kolton (counsel for Midwest in the current arbitration and member of Schiff Hardin Construction Law

---

[9] The College of Commercial Arbitrators' website reveals that there are 24 board members, 5 officers, and 10 committees with scores of committee members. Resort to the internet for matters such as this is perfectly appropriate. Richard J. Posner, *Remarks on Appellate Advocacy,* The Circuit Rider, 17 (Nov.2009).

[10] Mr. Friedlander's affidavit, attached as Ex. G to Midwest's Response to the Amended Petition to Vacate, implicitly does concede that he may have co-written an article for the construction or arbitration industry with Mr. Sklar. *See* ¶ 3. But he gives no more particulars, than does the Amended Petition to Vacate.

Group) was elected a Society Member on June 19, 2007. The members of the SOICA meet on a monthly basis. As Judge Easterbrook has said in another context, "So What?...Who cares?...True, but irrelevant." *Israel Travel Advis. Serv. v. Israel Iden. Tours*, 61 F.3d 1250, 1259 (7th Cir. 1995). *See also Tunis v. Gonzales*, 447 F.3d 547, 551 (7th Cir. 2006)(Posner, J.).

Not surprisingly, other than stating the fact that Mr. Sklar and a few Schiff Hardin lawyers are members of the same professional associations, have presented papers at a professional gathering, and wrote separate chapters for a multi-chapter course book in the area in which both practiced, Continuum's briefs make no attempt to explain how these parallel, professional involvements suffice to warrant the kind of discovery that all the courts have said should occur only under the most compelling of circumstances or how they would lead a "reasonable person" to have concerns about Mr. Sklar's impartiality.

We come then to the claimed collaborative effort of Mr. Sklar and Messrs. Lurie and Friedlander in having "co-authored a book" published by Lorman Education Services in 2008. *"What to Do When Construction Projects Go Bad in Illinois."* I have reviewed a copy of the "book," which is in fact a 324-page manual, consisting of multiple chapters authored by 11 authors. The claim of co-authorship of a "book" is untrue. Mr. Sklar authored a chapter entitled, "Risk Factors and Contractual Risk Allocation" and a chapter entitled, "Termination." Mr. Friedlander authored "Roll of the Architect/Engineer in the Construction Process." Mr. Lurie, Cornelius Riordan and Mr. Sklar are shown as having authored "Dispute Resolution While Continuing to Perform." Thus, the only apparent collaborative effort involves a single chapter in this manual, which was originally created for the seminar of the same name.

Paragraph 36 of the Amended Petition to Vacate charges that Mr. Sklar and Mr. Lurie co-

17

authored the *AAA Handbook on Construction Arbitration and ADR,* which was published in August 2007, a year after Mr. Sklar's disclosure statement, but before the arbitration. This allegation appears to be untrue. I have examined a copy of the actual book obtained from the D'Angelo Law Library of the University of Chicago. The book contains 44 articles. Mr. Sklar was the sole author of "Dangers in Drafting the Arbitration Clause," which appeared in Chapter 5 under the heading "Arbitration." Mr. Lurie was the sole author of the fourth article in that chapter, "Removing Roadblocks to Arbitration," and he was the sole author of the third article in Chapter 6, "Mediation," entitled "The Importance of Process Design to a Successful Mediation." All this is shown on Mr. Lurie's website and was easily accessible to Continuum before it filed its briefs in this case.

While Mr. Sklar had a continuing duty under the AAA rules to disclose to Continuum and to Midwest any interest or relationship, whether financial, business, professional or personal, "which might *reasonably* affect impartiality or lack of independence," the professional activities of Mr. Sklar discussed above simply did not trigger that obligation.[11] These were precisely the kinds of involvements that Continuum's own highly experienced lawyers could reasonably have assumed had and would continue to occur. "The very intimacy of the group from which specialized arbitrators are chosen suggests that the parties can justifiably be held to know at least some kinds of basic information about an arbitrator's personal and business contacts." *Matter of Andros,* 579 F.2d at 701. Indeed, the more successful the lawyer or his firm, the more likely these sorts of professional participations. And Mr. Sklar and all of the lawyers in the case were highly successful specialists.

Moreover, it is significant that Continuum does not deny that at least one of the firms involved

---

[11] The Amended petition also lists other events at which Mr. Sklar and one or more members of the Schiff Hardin Construction Law Group spoke after 2006. It serves no useful purpose to discuss each separately, for the analysis above applies equally to these parallel participations in professional activities.

18

in the case on Continuum's side, Stein, Ray & Harris, had precisely the same kinds of professional involvements with Mr. Sklar as Mr. Lurie and Mr. Friedlander had. (Reply Brief at 8, n.5). *See* Midwest's Response to Amended Petition to Vacate, at 11-12, and Exs. F-I [#101]. [12] Consequently, any suggestion that Continuum's counsel could not have been aware of the fact that Mr. Sklar and Messrs. Friedlander and Lurie were members of the same professional associations, co-spoke at professional seminars, and contributed chapters to various publications is baseless.

The cases do not begin to support the central thesis of Continuum's briefs that the professional involvements listed in the Amended Petition to Vacate were the kinds from which a reasonable person might question Mr. Sklar's impartiality. For example, even where an arbitrator's former law partner was counsel in the arbitration, discovery has not been allowed because that fact would not justify a reasonable person in concluding that the arbitrator was partial. *See Uhl*, 512 F.3d at 308. Nor has discovery been allowed where the arbitrator in a particular matter had served as many as 20 times as an arbitrator for one of the parties or where an arbitrator had previously acted as co-counsel in another matter with one of the attorneys representing a party to the arbitration. *Id.* at 307. *See also Matter of Andros*, 579 F.2d at 701.

In *Lucent Technologies, Inc.*, 379 F.3d 24 (2nd Cir. 2004), the defendant accused Lucent and the arbitrator of intentionally hiding his service as an expert witness for Lucent in another case. The defendant pointed out that the same lawyers had represented plaintiff in that case and in the current arbitration. The defendant argued that although judgment had been entered in the case in which the

---

[12] Continuum's Reply Brief seemingly disputes that Stein, Ray & Harris was one of its counsel in the arbitration. However, it is clear from the transcript of the proceedings that the firm appeared along with the Law Offices of Ira Gould on behalf of Continuum. *See* Ex. H to Midwest's Response to Amended Petition to Vacate.

arbitrator had served as an expert, his testimony was implicated in a new trial motion that had not been decided until six months after his appointment as an arbitrator in the current controversy, and an appeal was pending long after that. The Second Circuit held that even if it were to consider the defendant's belated claim that discovery should have been allowed, it would reject the claim because the above circumstances did not constitute "clear evidence of impropriety." *Id.* at 32.

In *Uhl*, the arbitrator and counsel for one of the parties had appeared in the same lawsuits together on several occasions, representing different parties, and on two occasions had jointly represented the same party. The district court found this all rather "pedestrian" and concluded that there was not clear evidence of any impropriety in the non-disclosure of these facts, and that there was no evidence that they enjoyed a business relationship. It simply was not unusual for lawyers in the area in which they jointly specialized to appear with "some degree of frequency." 466 F.supp.2d at 906. The court refused to allow discovery based upon the claim that "past professional associations could imply a current financial arrangement" between the arbitrator and counsel for plaintiff. *Id.* at 910. The court held that the requests for discovery rested solely on speculation. *Id.* [13]

Precisely the same set of circumstances exist here. Continuum's own evidence shows how common it is for construction lawyers to appear as arbitrators – who better to judge controversies involving construction related issues, *Merit Insurance Co.*, 714 F.2d at 679; *Matter of Andros Compania Maritima, S.A.*, 579 F.2d at 701 – and for them to appear as panelists at bar association and

---

[13] The Sixth Circuit affirmed the district court's finding that the party seeking discovery failed to present clear evidence of improper conduct, but added that discovery would have been disallowed even under a more relaxed standard. *Uhl*, 512 F.3d at 308.

continuing legal education seminars and to write articles in their field.[14] It is equally common for construction lawyers to appear on panels with them and to write articles in publications in which the arbitrator is also an author, along with many others. And, as in *Uhl*, the claimed evidence of impropriety, even when viewed in a light most favorable to Continuum, is speculative and does not support the conclusion that Mr. Sklar's professional activities show that there is "a reasonable probability that there may have been business referrals and other pecuniary interests between" Mr. Sklar and lawyers at Schiff Hardin's Construction Law Group. *Cf. also Apusento Garden (Guam) Inc. v. Superior Court of Guam*, 94 F.3d 1346, 1353 (9th Cir. 1996)(failure of arbitrator to disclose that he and owner's expert were limited partners in partnership that owned apartment complex in Hawaii did not create an objectively reasonable impression of bias, so as to permit superior court to vacate award); *United States Wrestling Federation*, 605 F.2d at 320 (connections that arbitrator and his law firm had with university that in turn had connections with party to the arbitration proceeding too speculative to require vacatur).

*Mutual Insurance Co.* is the kind of case in which there was clear evidence of impropriety. It stands in rather stark contrast to the instant case. There, the arbitrator failed to disclose that his

---

[14] Judge Posner phrased it this way in *Merit Insurance Co.*:

Thus, people who arbitrate do so because they prefer a tribunal knowledgeable about the subject matter of their dispute to a generalist court with its austere impartiality but limited knowledge of subject matter. 'The professional competence of the arbitrator is attractive to the businessman because a commercial dispute arises out of an environment that usually possesses its own folkways, mores, and technology. Most businessmen interviewed contended that commercial disputes should be considered within the framework of such an environment. No matter how determinedly judge and lawyer work to acquire an understanding of a given business or industry, they cannot hope to approximate the practical wisdom distilled from 30 or 40 years of experience.'

714 F.2d at 679.

family's insurance company had been entangled in a dispute with two of the parties of the arbitration, and that the arbitrator was under investigation concerning the alleged trust account violations involving the insurers. The court held that the arbitrator had a duty to disclose that relationship and emphasized that the non-disclosed dealings could not be "considered part of the ordinary course of an arbitrator's private business." 675 F.2d at 1200. In the instant case, the opposite is true.

Both Mr. Sklar's biography, which was submitted to the parties before he was selected (*See* Ex. B, Midwest's Response to the Amended Petition to Vacate)[#101], and his actual disclosure statement – to say nothing of his publicly available website – revealed the breadth of his professional involvements. Continuum's lawyers, who engaged in the same sorts of professional activities, could not have been under any illusions about the possibility that Mr. Sklar and the lawyers of Schiff Hardin's Construction Law Group would repeatedly continue to intersect professionally. *Cf. Uhl*, 466 F.Supp.2d at 906 (the arbitrator "qualified as having substantial experience as a products liability lawyer. Given [his and the plaintiff's] areas of concentration, it is reasonable to anticipate that their paths would cross frequently.").

The only contacts that antedated Mr. Sklar's 2006 initial disclosure to which the Amended Petition refers, occurred in 2004. The first involved Mr. Sklar and Mr. Lurie having co-developed continuing education programs for non-lawyer AAA construction panelists; the second, the claimed co-authorship of a book. As to the education programs, the Petition does not explain what they consisted of and does not provide the source from which the allegation is drawn. But even assuming it were true, Mr. Sklar's non-disclosure was inconsequential, and Continuum has not cited a single case remotely suggesting otherwise. "Nondisclosure alone" is not decisive. *Positive Softwear Solutions, Inc. v. New Century Mortgage Corporation*, 476 F.3d 278 (5th Cir. 2007). "An arbitrator's

22

failure to disclose must involve a significant compromising connection to the parties." *Id.* The same analysis applies to the allegation that Mr. Sklar and Mr. Lurie were also presenters at an Arbitration Training Institute seminar, A Comprehensive Training in Commercial Arbitration, held in May 2004, at Golden State University, San Francisco, California. If true, all that can be divined from this is that both men enjoyed sufficient prominence in the construction law community that it was thought desirable to invite them to participate in a seminar. *See also supra* at 18, n.10.

Finally, Continuum alleges that Mr. Sklar and Mark Friedlander "co-authored" *Construction Law in Illinois, 2004 Edition*, for the Illinois Institute for Continuing Legal Education. This claim of cooperative activity was obviously designed to suggest a relationship of some intimacy or at least the possibility that one might have existed (from which Continuum argues that there was "also a reasonable probability that there may have been business referrals and other pecuniary interests between these parties."(Reply at 8)). Quite apart from the illogic of the conclusion, the allegation of co-authorship appears not to be true. I have reviewed a copy of the 2004 edition of *Construction Law in Illinois* (as Amended in 2007), obtained for me by the Seventh Circuit's librarian. The volume, like all IICLE publications, consists of multiple chapters, with multiple authors. This particular one contains 19 chapters with 28 authors. Mr. Sklar was the General Editor and the sole author of "Bidding Construction Projects" (Chapter 1) and "Contractors/Subcontractor Contracts and Risk Allocation" (Chapter 5). He co-authored Chapter 11, "An Overview of the Illinois Mechanics Lien Act" with Ms. Domagala-Pierga. Mr. Friedlander co-authored chapter 19, "Construction Defects" with James D. Weier, Jr. However one may describe the participation of Mr. Sklar and Mr. Lurie, it

is simply inaccurate to say he co-authored the book.[15]

Any argument that simultaneous authorship in a professional publication by Mr. Sklar and Schiff Hardin lawyers reasonably called Mr. Sklar's impartiality into question is a non-starter. The same is true of their participation in ABA and other seminars. This is not "the sort of information an arbitrator would reasonably regard as creating an impression of possible bias," *Matter of Andros*, 579 F.2d at 701, nor did it reflect the kind of "significant compromising connection to the parties," *Positive Softwear Solutions, Inc. v. New Century Mortgage Corporation*, 476 F.3d 278 (5th Cir. 2007)(*En Banc*), which can be deemed to reflect on an arbitrator's impartiality.

Under the paragraph of Mr. Sklar's 2006 disclosure form captioned, "Disclosure Paragraphs Regarding Specific Participants or Issues in the Case," Mr. Sklar disclosed, as he did in his biography previously submitted to the parties, that: he was a member of various professional organizations, which he enumerated, that he had lectured in construction seminars, he knew certain of the Schiff Hardin lawyers, he had been in the past adverse to members of Schiff's Construction Practice Group, including Mr. Lurie and Mr. Friedlander, neither of whom was involved in the case. (Reply at 8; Amended Counter-Petition to Vacate Arbitration Award, Ex. A)[#98]. He noted that he was involved in two pending matters with Mr. Friedlander, which he described.

What we have said is enough to decide the issue. Nonetheless, it is informative to review Mr. Sklar's June 2006 disclosure document, which was submitted pursuant to AAA rules for the express purpose of disclosing "any known facts that are likely to give rise to a justifiable doubt about, or that a reasonable person would consider likely to affect [Mr. Sklar's] impartiality or independence as an

---

[15] The volume as amended in 2007 lists at the beginning the authors of the chapters in the 2004 edition.

arbitrator" in the case. (See Amended Counter-Petition to Vacate Arbitration Award, Ex. A)[#98]. Mr. Sklar disclosed that he was a lawyer since 1964, concentrating in construction law since 1975. He noted that he had served on "numerous committees in local and national bar associations in the construction and real estate area," and that he had spoken at "many conferences and seminars" and that he had also personally attended many construction conferences and seminars and that "[c]ounsel and/or the parties and/or any witnesses may have attended such conference or seminars and even had personal contact with me at that time...." *Id.* at page 3. However, Mr. Sklar noted that he had no "independent recollection of personal contact with them or their attendance or participation" in any particular conference or seminar. *Id.* Moreover, the disclosure form stated that neither Mr. Sklar nor his firm maintained a database of past professional contacts and that the disclosures were "drawn from [his] existing personal knowledge within the limits of my present recollection."

Continuum's counsel were themselves accomplished professionals, who practiced in the same area as Mr. Sklar and Schiff Hardin's lawyers and were admittedly participants in the same sorts of professional endeavors as those generically described to in the disclosure document and in Mr. Sklar's biography, which they also had. As sophisticated specialists themselves, they knew that an arbitrator's disclosure need not be "a complete and unexpurgated business biography." *Commonwealth Coatings*, 393 U.S. at 152. Disclosure requirements "are intended to be applied realistically so that the burden of detailed disclosure does not become so great that it is impractical for persons in the business world to be arbitrators, thereby depriving the parties of the services of those who might be the best informed and qualified to decide particular types of cases." *Merit Insurance Co.* at 679. Hence, the fact that Mr. Sklar's disclosure statement did not itemize the three events in 2004 about which they now complain could not have come as a surprise to Continuum's

lawyers.

While conceding that Mr. Sklar was not required to disclose his "entire unexpurgated business biography" (Reply at 9), Continuum nonetheless insists that by revealing that he had been adverse to one of the Schiff lawyers in an earlier matter, *see supra* at 23, Mr. Sklar's June 2006 disclosure statement failed to "even alert Continuum to the fact that there could be any sort of potential, personal or professional relationship between him and Schiff Hardin's" Construction Law Group. *Id.* But to specify that one had been adverse prior to 2006, could not possibly have connoted to any reasonable lawyer that there could not have been any sort of past professional relationship. It is even more idle to insist that the disclosure of prior adversity could not have alerted Continuum to the fact that "there could be *any sort of potential*, personal or professional relationship" between Mr. Sklar and any lawyer in the Schiff Hardin Construction Law Group. (Emphasis supplied). It is obviously impossible to forecast "events still in the womb of time," *Dennis v. United States*, 341 U.S. 494, 551 (1951)(Frankfurter, J., concurring), and Mr. Sklar was not required to try to do so by the rules of the American Arbitration Association. And as a matter of common experience, prior, isolated professional adversity would not lead any reasonable observer to conclude that there could or would not in the future be *"any sort of potential"* in the kind of professional activities in which Continuum's own lawyers were active participants and in which successful lawyers in all specialties engage.

## CONCLUSION

The cases make clear that where the evidence of claimed impropriety is speculative, attenuated, uncertain, or indirect, discovery will not be allowed. The Amended Petition to Vacate rests on such equivocal evidence, for it openly avers that its claim of impropriety (and evident partiality, itself) is, in part, based on "facts that are *insinuated and implied* in th[e] allegations" of

professional involvement of Mr. Sklar and Messrs. Lurie and Friedlander. (Amended Brief at 2)(Emphasis supplied). And the "allegations" from which those insinuations are drawn, involving as they do parallel, professional involvement in publicly disclosed seminars and contributions to legal publications, are insufficient to justify post-arbitration discovery. And they most assuredly do not support Continuum's ultimate conclusion that they evidence "a system of referrals and ongoing economic and professional business relationships between Mr. Sklar, the Construction Law Group at his firm, and lawyers in the Construction Law Group of...Schiff Hardin."

The Sixth Circuit's caution in *Uhl* bears repeating:

> We will not rush to conclude that an arbitrator is evidently partial. Arbitrators are often chosen for their expertise and community involvement, so '[t]o disqualify any arbitrator who had professional dealings with one of the parties (to say nothing of a social acquaintanceship) would make it impossible, in some circumstances, to find a qualified arbitrator at all.'

512 F.3d at 308. *See also Merit Insurance Co*, 714 F.2d at 678 ("Notwithstanding the broad language of section 18, no one supposes that either the Commercial Arbitration Rules or the Code of Ethics for Arbitrators requires disclosure of every former social or financial relationship with a party or a party's principals.").

This is not to say that arbitrators should not err on the side of disclosure. They should, *Merit Insurance Co.*, 714 F.2d at 678-679; *U.S. Wrestling Federation*, 605 F.2d at 319 – especially where a challenged contact occurs during the arbitration, as Continuum alleges occurred on a few occasions here. But, even then, what is not disclosed must have significance apart from the mere fact of non-disclosure. What was not disclosed in this case cannot be said to constitute clear evidence of impropriety warranting post-arbitration discovery. There being no evidence, let alone clear evidence,

27

that would warrant a departure from the deeply held sentiment that post-arbitration discovery should be allowed only in exceptional circumstances, Continuum's Motion for Leave to Take Limited Discovery [# 79] is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 6/21/10

28